No. 2014-1380

# United States Court of Appeals for the Federal Circuit

GAMECASTER, INC.,

*Appellant,*

v.

DREAMWORKS ANIMATION SKG, INC.,

*Appellee.*

**Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, Appeal No. 2013-000375, Reexamination Application/Control No. 95/000,493**

**BRIEF FOR DREAMWORKS ANIMATION SKG, INC.**

CHRISTOPHER B. EIDE
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304
Telephone:  650.813.5600

CHARLES S. BARQUIST
MORRISON & FOERSTER LLP
707 Wilshire Blvd.
Los Angeles, California 90017
Telephone:  213.892.5400
CBarquist@mofo.com

MARC A. HEARRON
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, N.W.
Suite 6000
Washington, D.C. 20006
Telephone:  202.778.1663

*Counsel for Appellee DreamWorks Animation SKG, Inc.*

# CERTIFICATE OF INTEREST

Counsel for appellee DreamWorks Animation SKG, Inc. certifies the following:

1.    The full name of every party or amicus represented by me is:

DreamWorks Animation SKG, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own 10% or more of the stock of the party or amicus curiae represented by me are:

N/A

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me below or that are expected to appear in this court are:

MORRISON & FOERSTER LLP: Charles S. Barquist, Christopher B. Eide, Marc A. Hearron, Peter J. Yim


Dated:  August 22, 2014                          s/ Charles S. Barquist

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES ..................................................................v

STATEMENT OF RELATED CASES ................................................. vii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES...........................................................1

INTRODUCTION ...............................................................................2

STATEMENT OF THE CASE..............................................................5

    A.    Gamecaster's '220 Patent...........................................5

    B.    Prior Art References.................................................11

        1.    The Paley article................................................12

        2.    The Vincent patent.............................................15

    C.    Proceedings Below...................................................16

        1.    Reexamination proceedings before the Examiner ....16

        2.    Proceedings before the Board .............................20

SUMMARY OF ARGUMENT ............................................................23

STANDARD OF REVIEW .................................................................26

ARGUMENT ...................................................................................27

I.    PALEY TEACHES "A VIRTUAL CAMERA CAPTURING A VIEW WITHIN A VIRTUAL ENVIRONMENT" .....................................27

    A.    Substantial Evidence Supports The PTO's Finding That, Even Under Gamecaster's Construction Of "Capturing," Paley Teaches "Capturing A View"...........................................27

1.  Paley indicates that the views obtained by the Cyclops are recorded or stored by an animation program .......................28

2.  It was well known in the art that animation scenes would be recorded for later editing, processing, and viewing.............31

3.  The Cyclops's display of real-time previews of the view captured by the Cyclops necessarily involves storing or recording the view....................................................................32

B.  Alternatively, Paley Teaches The "Capturing A View" Limitation Under The Broadest Reasonable Construction Of "Capturing" .........................................................................34

1.  The specification is consistent with "capturing" a view without necessarily recording or storing it ................................35

2.  Gamecaster's construction of "capturing" would render independent claims narrower than certain of their dependent claims.......................................................................38

3.  Gamecaster's claim-differentiation argument is waived and, in any event, is without merit..............................................40

4.  None of Gamecaster's extrinsic evidence narrows the meaning of "capturing"...............................................................42

II.  SUBSTANTIAL EVIDENCE SUPPORTS THE PTO'S FINDING THAT THE CLAIMED MOVEMENT SENSORS ARE DISCLOSED BY PALEY OR BY PALEY IN VIEW OF VINCENT........44

A.  Paley Discloses The Recited Movement Sensors ................................45

B.  The Claimed Movement Sensors Are Disclosed By Vincent, And It Would Have Been Obvious To Use Them With Paley's Cyclops ..........................................................................................48

III.  PALEY TEACHES A "VIRTUAL ENVIRONMENT BEING GENERATED WITHOUT IMAGES CAPTURED BY A CAMERA WITH AN IMAGE SENSOR"....................................................................54

CONCLUSION ......................................................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*C.W. Zumbiel Co. v. Kappos*,
  702 F.3d 1371 (Fed. Cir. 2012) ........................................................26

*Consolidated Edison Co. v. NLRB*,
  305 U.S. 197 (1938).........................................................................26

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
  438 F.3d 1374 (Fed. Cir. 2006) ........................................................41

*Dickinson v. Zurko*,
  527 U.S. 150 (1999).........................................................................34

*In re Baker Hughes Inc.*,
  215 F.3d 1297 (Fed. Cir. 2000) ........................................................26

*In re Baxter Int'l, Inc.*,
  678 F.3d 1357 (Fed. Cir. 2012) ..................................................26, 53

*In re Teles AG Informationstechnologien*,
  747 F.3d 1357 (Fed. Cir. 2014) ........................................................26

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007).............................................................34, 49, 51

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
  744 F.3d 1272 (Fed. Cir. 2014) (en banc) ........................................26

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ......................40, 41, 42, 43

*SmithKline Beecham Corp. v. Apotex Corp.*,
  439 F.3d 1312 (Fed. Cir. 2006) ................................................*passim*

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
  723 F.3d 1363 (Fed. Cir. 2013), *cert. granted*, 134 S. Ct. 1761 (2014).............26

*Tolbert v. Queens Coll.*,
242 F.3d 58 (2d Cir. 2001) ................................................................40

*TriMed, Inc. v. Stryker Corp.*,
608 F.3d 1333 (Fed. Cir. 2010) .........................................................33

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
239 F.3d 1225 (Fed. Cir. 2001) .........................................................41

## STATUTES AND REGULATIONS

35 U.S.C. § 102 ....................................................................................16

35 U.S.C. § 103(a) (2006).....................................................................26

37 C.F.R. § 1.68 ....................................................................................53

## OTHER AUTHORITIES

Chisum on Patents § 18.03.....................................................................41

Dictionary.com, http://dictionary.reference.com/browse/capture ...........43

Merriam-Webster Online Dictionary, http://www.merriam-webster.com/
dictionary/capture ...............................................................................43

## STATEMENT OF RELATED CASES

The Court's decision in this appeal may directly affect or be affected by *Gamecaster, Inc. v. DreamWorks Animation SKG, Inc.*, No. CV 09-2723 (C.D. Cal.), which has been stayed pending this appeal. Counsel for appellee are unaware of any other case pending in this or any other court that may directly affect or be affected by this Court's decision.

## JURISDICTIONAL STATEMENT

The Patent Trial and Appeal Board of the United States Patent and Trademark Office had jurisdiction over the appeal from the Examiner's final reexamination ruling under 35 U.S.C. §§ 6(b)(2) and 134(b).  The Board mailed its decision on December 12, 2013.  Appellant Gamecaster, Inc. appealed on February 7, 2014.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1.    Whether the PTO's factual finding that the Paley article discloses "a virtual camera capturing a view within a virtual environment" should be affirmed for either of two independent reasons:

a.    substantial evidence supports the PTO's finding that Paley discloses "capturing a view," even under Gamecaster's narrow construction of "capturing" as requiring storing or recording of images; or

b.    the broadest reasonable meaning of "capturing a view" includes simply obtaining or extracting a view without necessarily recording or storing images.

2.    Whether substantial evidence supports the PTO's factual finding that Paley, or alternatively Paley in combination with the Vincent patent, teaches the recited movement sensors.

3.      Whether substantial evidence supports the PTO's factual finding that Paley teaches a "virtual environment being generated without images captured by a camera with an image sensor."

## INTRODUCTION

The technology at issue in this case relates to devices that can be used to view a virtual or animated environment that does not exist in the real world but is generated by a computer.  Gamecaster's U.S. Patent No. 7,403,220 is directed to a camera-simulating device and methods used to control a virtual camera.  When the user controls the camera-simulating device, the views of the virtual environment captured by the virtual camera are changed in a manner corresponding to the user's control of the device.  This occurs through movement sensors and a camera controller, which generate signals that change the view of the virtual environment in response to the user's movement and control of the device.

Well before Gamecaster submitted its application for what issued as the '220 patent, Bradford Paley published an article discussing his own invention of the same apparatus and methods.  Specifically, Paley's article discloses an invention called the Cyclops, a camera-like tool that permitted the user to employ traditional camera controls and movements to manipulate views within virtual, animated environments.  As described in the Paley article, the Cyclops comprised a tripod outfitted with traditional camera controls.  But because the Cyclops is a virtual

camera that is used to capture the action occurring in an animated environment, there is no actual camera mounted on the tripod.  In its place is a flat-panel display acting as the virtual camera's virtual viewfinder, providing a window to a view of the animated environment.  The user operates the controls mounted on the tripod to follow the action happening within the animated environment.  As the user moves the Cyclops, just as one would move a real-world camera, sensors monitor the movement, and the angles of movement are fed into the animation program.  The animation program uses the information about the "camera's" movements to change the view—what is being displayed on the screen.  The Cyclops thus allows the use of traditional camera techniques to capture a scene from a virtual, animated environment.

The Examiner initiated *inter partes* reexamination proceedings and correctly rejected all 46 claims of Gamecaster's patent.  On appeal, the Board affirmed the rejection of all appealed claims as obvious over Paley in view of a prior art patent referred to as the Vincent patent.  That obviousness rejection was based on several factual findings about what is disclosed in Paley and Vincent.  The PTO carefully examined Paley's disclosures and correctly found each limitation taught by Paley alone.  But even if one of the limitations—the recited movement sensors—was not taught by Paley, the PTO found that those sensors were well known in the art and would have been obvious to a person of skill in the art, especially in light of the

Vincent patent's disclosure of the movement sensors in a camera-image control system.

Gamecaster challenges only the PTO's rejection of certain claims—claims 17–33 and 42–46. Gamecaster's primary argument is not that the PTO purportedly made legal errors in rejecting the claims but rather that the PTO's factual findings were wrong. Each of the PTO's findings, however, is well supported by substantial evidence and should be affirmed. In the course of challenging the PTO's factual findings, Gamecaster makes several "arguments" only tersely, in conclusory fashion, and without any explanation. Under well-established appellate rules, these undeveloped assertions are insufficient, and therefore those arguments are waived. In any event, substantial evidence supports all the PTO's findings.

Gamecaster's brief does raise one legal question: it challenges the broadest reasonable meaning of the limitation that the virtual camera "captur[es] a view" of the virtual environment. But the PTO found that even under Gamecaster's narrow construction, Paley still teaches this limitation. Because that finding is supported by substantial evidence, this Court need not even reach the claim-construction issue. Even if the Court does reach the issue, the intrinsic record does not support Gamecaster's narrow construction.

In short, there were no factual or legal errors in the PTO's rejection of Gamecaster's claims. The Board's decision should be affirmed.

## STATEMENT OF THE CASE

### A.    Gamecaster's '220 Patent

Gamecaster's '220 patent, which is titled "Apparatus, Methods, and Systems for Viewing and Manipulating a Virtual Environment," is generally directed to systems and methods for viewing and manipulating a virtual environment. A39 (col.2:7–10). Based on a provisional patent application filed in August 2004, the patent relates "to a system wherein a virtual video game producer, director, camera person, or other individual manipulates a virtual interface device within the virtual game space." A39 (col.1:25–28). According to the patent, the invention is designed to allow a person to view and navigate within a virtual environment— e.g., to allow "a third-party viewer of [a video] game to move within the virtual environment of the video game as an observer of the play action." A39 (col.1:57– 59). The alleged invention is intended to "permit[] fans and aficionados of virtual systems, including video games, to view action packed, real-time or delayed-time, professionally edited and viewable video images." A39 (col.1:62–65).

The '220 patent states that "video camera components" may be provided for input to or output from a virtual environment. A39 (col.2:10–15). "The video camera components may be stand-alone devices, or alternatively, devices

mountable on a tripod or other camera mounting equipment." A39 (col.2:15–18). "Each video camera component permits a person operating such component, as for example a camera person, to select from multiple views, and to manipulate the video camera component in a predefined or user defined fashion." A39 (col.2:23–26). "Exemplary movements [of the video camera components] include a rotation leftward or rightward, a tilt upward or downward, a translation (for example, a track movement) leftward, rightward, forward, or backward, a rolling leftward or rightward, a zooming inward or outward, and a camera position adjustment (for example, crane movement) upward or downward." A39 (col.2:26–32).

The '220 patent describes an embodiment in which "the video camera component is designed to provide video capture from within the virtual environment that emulates very closely video capture from real world events." A39 (col.2:33–36). "Accordingly, the video camera component may permit a professional motion picture camera person to extract views and employ devices recognized in the motion picture art resulting in video images of virtual environments having the attributes of video capture of real world events." A39 (col.2:36–40).

At issue in this appeal are independent claims 17, 24, and 42, and dependent claims 18–23, 25–33, and 43–46.

Independent claim 17 is an apparatus claim for a camera-simulating device for controlling a virtual camera that is capturing a view within a virtual environment that is entirely generated by a video software application. Claim 17 requires (1) a horizontal sensor to provide a horizontal movement signal in accordance with the apparatus's horizontal acceleration or rate of movement, (2) a vertical sensor to provide a vertical movement signal in accordance with the apparatus's vertical acceleration or rate of movement, (3) a camera control input device to provide a control input device signal in response to user action, and (4) a control signal generator for generating a virtual camera control signal, which is a command to change the view captured by the virtual camera based on the horizontal movement signal, the vertical movement signal, or the control input device signal. Claim 17 recites as follows:

> 17. A camera simulating device for controlling *a virtual camera capturing a view within a virtual environment* that is entirely generated by a video software application, *the virtual environment being generated without images captured by a camera with an image sensor*, the camera simulating device comprising:
>
> *a horizontal sensor* configured to provide a horizontal movement signal in accordance with a horizontal movement of the camera simulating device, the horizontal sensor comprising any one of a horizontal angular acceleration sensor configured to provide the horizontal movement signal in accordance with a horizontal acceleration of the apparatus and a horizontal angular rate sensor configured to provide the horizontal movement

signal in accordance with a horizontal rate of movement of the apparatus;

*a vertical sensor* configured to provide a vertical movement signal in accordance with a vertical movement of the camera simulating device, the vertical sensor comprising any one of a vertical angular rate sensor configured to provide the vertical movement signal in accordance with a vertical rate of movement of the apparatus and a vertical angular rate sensor configured to provide the vertical movement signal in accordance with a vertical acceleration of the apparatus;

a camera control input device configured to provide a camera control input device signal in response to user actions;

a control signal generator configured to generate a virtual camera control signal based on at least one of a plurality of signals comprising the vertical movement signal, the horizontal movement signal, and the camera control input device signal, the virtual camera control signal recognizable by the video software application as at least one of a plurality of commands to change the view captured by the virtual camera of the virtual environment.

A53 (col.29:52–col.30:21) (claim terms at issue emphasized).

Independent claim 24 recites a method for generating a camera control signal for controlling a virtual camera capturing a view within a virtual environment that is generated by a software application. Claim 24 contains the steps of (1) receiving a camera control input device signal, (2) receiving a movement sensor signal, and (3) generating a camera control signal based on the camera control input device signal and the movement sensor signal. Claim 24 recites as follows:

8

24.  A method comprising:

receiving a camera control input device signal from a camera control input device;

receiving a *movement sensor signal* based on a movement of the user input device, the movement sensor signal comprising any one of a vertical rate signal, a vertical acceleration signal, a horizontal rate signal, and a horizontal acceleration signal; and

generating a camera control signal comprising generating a virtual camera control signal for controlling *a virtual camera capturing a view within a virtual environment* that is entirely generated by a software application, *the virtual environment being generated without images captured by a camera with an image sensor*, and the generating a virtual camera control signal being based on the camera control input device signal and the movement sensor signal.

A54 (col.31:15–31) (claim terms at issue emphasized).

Independent claim 42 is a method claim corresponding to independent apparatus claim 17.  Claim 42 recites a process for generating a camera control signal based on received signals from the apparatus generally recited in claim 17.  Claim 42 recites:

42.  A method performed in a camera simulating device for generating a virtual camera control signal for controlling *a virtual camera capturing a view within a virtual environment* that is entirely generated by a video software application, *the virtual environment being generated without images captured by a camera with an image sensor*, the method comprising:

receiving a *horizontal movement signal* of the camera simulating device, the horizontal movement signal

> comprising any one of a horizontal rate signal and a horizontal acceleration signal;
>
> receiving a *vertical movement signal* in accordance with a vertical movement of the camera simulating device, the vertical movement signal comprising any one of a vertical rate signal, and a vertical acceleration signal;
>
> receiving a camera control signal generated by a camera control input in response to user actions;
>
> generating a virtual camera control signal based on at least one of a plurality of signals comprising the vertical movement signal, the horizontal movement signal, and the camera control signal, the virtual camera control signal recognizable by the video software application as at least one of a plurality of camera commands to change the view captured by the virtual camera within the virtual environment.

A55 (col.33:31–col.34:10) (claim terms at issue emphasized).

The bulk of the dependent claims are directed to well-known camera control input devices, sensors, signals, and applications. It is undisputed for purposes of this appeal that the dependent claims rise or fall with the independent claims.

The specification provides information about the types of movement sensors (i.e., horizontal sensors and vertical sensors) contemplated by the '220 patent. The specification explicitly identifies accelerometers, gyroscopes, and potentiometers as exemplary movement sensors. A50 (col.24:33–41, col.24:50–54). The specification goes on to state that any type of sensor known in the art may be used: "As known to skilled persons, however, any combination of sensors may be used to measure relative displacement in any type of direction." A50 (col.24:41–44).

### B.    Prior Art References

On reexamination, the Examiner found the claims of the '220 patent anticipated by each of seven different prior art references, none of which were cited in the file history:

1. *Paley*:   an article by W. Bradford Paley titled "Interaction in 3D Graphics:  Designing Special-Purpose Input Devices" (A1095–A1111);

2. *Schnädelbach*:   an article by H. Schnädelbach, et al., titled "The Augurscope:  A Mixed Reality Interface for Outdoors";

3. *Tsang*:  a thesis by M. Tsang, titled "Boom Chameleon:  Simultaneous Capture of 3D Viewpoint, Voice and Gesture Annotations on a Spatially-Aware Display";

4. *Titcomb*:  U.S. Patent No. 7,038,660, awarded to Andrew E. Titcomb, et al., titled "Wheel Motion Control Input Device for Animation System";

5. *Zwern*:  U.S. Patent Application No. 2002/0158815 from Arthur L. Zwern, titled "Multi Axis Motion and Position Controller for Portable Electronic Displays";

6. *Wormell*:  an article by D. Wormell, et al., titled "Advancement in 3D Interactive Devices for Virtual Environments"; and

7. *Rallison*:  U.S. Patent No. 6,369,952, awarded to R. Rallison, et al., titled "Head-Mounted Personal Display Apparatus with Image Generator and Holder."

A765–A767, A841–A842; *see* A82–A85.

In addition, the Examiner concluded that the claims were obvious over Paley in view of U.S. Patent No. 7,050,102 awarded to Robert S. Vincent and titled "Spatial Referenced Photographic System with Navigation Arrangement" (A1112–A1170).  A765, A841.

The Board relied only on Paley and Vincent to conclude that the claims are invalid as obvious.  Accordingly, only Paley and Vincent are discussed below.

## 1.    *The Paley article*

Bradford Paley is the President of Digital Image Design Incorporated (DID), which designs special-purpose input devices that are used in the creation of animation.  A1171.  Paley's 1998 article describes several tools that DID created to speed up computer animation, as well as the process that DID applies when asked to develop new special-purpose input devices.

One such device is called the Cyclops, illustrated below:



A1100.

The Cyclops was designed to allow already-familiar camera equipment and techniques to be used to view or record action occurring in a virtual or animated environment.  That is, after a computer animator creates an animated scene, the Cyclops can be used to view or record the scene similar to how a real-world scene would be filmed.  A1100 (Cyclops enables a user "to direct the camera to follow some action" within a computer animation).  The Cyclops is a standard fluid-head tripod with a flat-panel display mounted on top where a camera would normally attach.  A1101.  The view of the animated scene being captured by the virtual camera is displayed in the flat-panel display, similar to the viewfinder of a

traditional camera.  As the user moves the virtual camera to change the view being

captured, the Cyclops feeds the virtual camera's tilt (i.e., vertical) and pan (i.e.,

horizontal) angles into an animation program.  A1101.  The animation program

changes the view of the animation scene according to the changes in the movement

of the virtual camera, and a real-time view of the animation is displayed on the

flat-panel display.  A1101.

Paley describes the Cyclops as follows:

> We were asked to develop another device, the
> Cyclops, by computer animation director Steve Katz.
> It[']s a simple concept: take a standard fluid-head tripod
> and instrument it, then mount a flat-panel display on the
> tripod where the camera would normally go.  Now feed
> the tilt and pan angles into the animation program, while
> simultaneously displaying a real-time preview of the
> animation.  Voila!  You[']ve brought camera control
> back out into the real world.

A1101.

According to Paley, one of the benefits of the Cyclops is that a computer

animator can easily and quickly change the view of the animated environment

using a familiar camera-like device rather than going through the more difficult

process of editing the scene on the computer:  the device "essentially allows the

animator[']s body to instantly make what would normally be a computer operator-

ish mode change done by clicking keys or on-screen buttons."  A1101.  Paley

describes the device as "completely intuitive to use, and one that taps into years of

14

experience that a cinematographer may have acquired on the somatic level. We[']re using the interaction of cinematographer[']s eye and visual sense (where the artist is), muscle-memory of the arm and hand (where the training is) and the grip and fluid-damped head of the tripod." A1101.

### 2.    *The Vincent patent*

The Vincent patent (A1112–A1170) is directed to a video-recording system that records not only images but also data about the position of the camera and/or the object being recorded. Relevant here, Vincent discloses that the system that tracks the camera position and orientation information works by using "accelerometers and gimbal-mounted gyroscopes." A1143 (col.2:41–42). According to Vincent, "[a]s the operator of the video camera moves about taking a motion picture of the environment, a microprocessor and logic associated with the accelerometers and gyroscopes senses all rotational motions of the camera by means of sensors associated with the gimbals and senses all translational motions of the camera by means of sensors associated with the accelerometers." A1143 (col.2:43–49). Vincent states that the components that go into the position-tracking unit, including the accelerometers and gyroscopes, are "commonly available equipment." A1143 (col.2:35).

Vincent played a significant role during initial prosecution of the '220 patent. During prosecution, the Examiner rejected the proposed claims as being

anticipated by Vincent.    A92.    In response to the rejection over Vincent, Gamecaster amended the independent claims to make clear that the claimed apparatus and method were limited to controlling a virtual camera in a virtual environment generated without images captured by an image sensor.  A93–A94. With those amendments, the Examiner allowed the claims of the '220 patent. A94–A95.

In the reexamination proceedings below, Vincent was relied upon solely to show that movement sensors were known in the art.

## C.    Proceedings Below

### 1.    *Reexamination proceedings before the Examiner*

DreamWorks submitted a request for *inter partes* reexamination, contending that all the claims of the '220 patent (i.e., claims 1–46) are invalid in light of the seven prior art references enumerated above.    A56–A138 at A82–A85.    The Examiner agreed with DreamWorks that each cited reference, either alone or in combination with Vincent, raised a substantial new question of patentability and thus granted the request for *inter partes* reexamination.  A350–A370.

The Examiner initially rejected all of the claims of the '220 patent under 35 U.S.C. § 102 as being anticipated by each of the seven new references cited in the request.    A371–A376, A450–A453.    With respect specifically to Paley, the Examiner rejected claims 1–46 both as anticipated by Paley and, in the alternative,

under 35 U.S.C. § 103(a) as obvious over Paley in view of Vincent.    A450.

Throughout two rounds of briefing by Gamecaster and DreamWorks, the Examiner

maintained his rejection of claims 1–46 as anticipated by each of the seven

references and as obvious over Paley in view of Vincent.    A509–A514; A528–

A550; A561–A580, A590–A592, A666–A670; A671–A680; A686–A717; A730–

A751, A764–A767, A841–A845.

Because the Board addressed only the Examiner's rejection of the claims as

obvious over Paley in view of Vincent, the Examiner's discussion of only those

references is discussed below:

**Capturing a view.**    The Examiner found that Paley discloses a "virtual

camera capturing a view within a virtual environment."    A733–A736.    In so

finding, the Examiner rejected Gamecaster's argument that "capturing" a view

requires not only obtaining or extracting a viewpoint but also requires recording or

storing it.    A734.    The Examiner concluded that Gamecaster's construction was not

the broadest reasonable construction of "capturing."    The Examiner explained that

"[t]he premise that a real camera must record images it captures . . . is incorrect."

A734.    "For example, a digital video recorder or digital camera typically includes a

preview display screen, which can display a preview of the images 'captured' by

the device without necessarily being in a record mode or saving a snapshot to a

storage device, e.g., the images are captured at least for purposes of display

without recording the captured images to permanent memory storage." A734. "Further, a camera shooting a live event and transmitting the captured views, e.g., to a server or satellite, does not 'record' in the sense asserted by the patent owner. As such, the act of capturing images of a virtual environment does not require storing or recording the images." A734.

The Examiner also reasoned that the intrinsic evidence does not support Gamecaster's construction of "capturing a view." Gamecaster's construction would construe dependent claims more broadly than the independent claims from which they depend. A735. Moreover, the specification "indicate[s] that capture means to collect, extract, or obtain the views of the virtual environment similar to what a real world camera person would do (e.g., via similar devices, camera movements, etc.), but no description in the '220 patent indicates or suggests that 'capture' is limited to meaning extract and record." A736. "Further, the patent describes certain embodiments for use within a Gamecaster Cybercam facility, where each camera person therein can set in real time his or her video camera component to display or permit viewing of one or more perspective views from within the video game." A736 (citing A47–A48 (col.18:49–col.19:8)). "These descriptions are clearly similar to a real camera person with a real camera transmitting live shots of a sporting event or television show for display, but do not require that the camera necessarily have film or record the camera shots." A736.

In any event, the Examiner concluded that, even accepting Gamecaster's construction, Paley discloses "capturing" virtual images. The Examiner explained that "the real time preview display of the view of the virtual environment with the LCD monitor [on the Cyclops device] inherently discloses that the captured view is recorded or stored at least long enough to display." A747–A748. "That is, the act of displaying the viewpoint of the virtual environment by Cyclops via the LCD monitor, at the very least, evidences that the virtual environment was captured and recorded long enough to generate the displayed view." A748.

***Movement sensors.*** The Examiner also found that Paley discloses movement sensors as recited in the claims of the '220 patent. In so finding, the Examiner concluded that the broadest reasonable construction of the movement sensor limitations (i.e., horizontal and vertical sensors) required only signals that measure relative displacement without necessarily measuring rate and acceleration. A748–A749. The Examiner explained that "the specification of the '220 patent describes that camera control input signals may include signals associated with relative displacement (*i. e.*, position) of camera control input devices." A748–A749.

Applying that construction, the Examiner found that Paley teaches movement sensors because Paley states that the Cyclops device feeds the tilt and pan angles into the animation program. Feeding the tilt and pan angles into the

animation program tells the program the relative displacement of the camera control input devices. Moreover, "converting angular position signals to angular rate signals or angular acceleration signals is a simple software calculation (e.g., angular position over time) that would have been well within the skill of one of ordinary skill in the art." A737.

In any event, the Examiner found that Vincent plainly discloses movement sensors and that "modifying Paley to include the recited sensors in light of Vincent, or other prior art device sensors, would have merely employed well-known devices and processes with no change in their respective functions, the combination yielding predictable results." A751. The Examiner rejected Gamecaster's assertion that Vincent teaches away from the proposed combination of Paley and Vincent. A751. The Examiner reasoned that "the references do not criticize, discredit, or discourage the solutions disclosed in the references proposed for combination." A751.

## 2.    *Proceedings before the Board*

Gamecaster appealed only the Examiner's final rejection of claims 17–33 and 42–46. Gamecaster did not appeal the final rejection of claims 1–16 and 34–41, and accordingly those claims stand rejected. A854. The Board affirmed the Examiner's rejection of claims 17–33 and 42–46 as obvious over the combination of Paley and Vincent. A2–A10.

***Capturing a view.*** The Board found that Paley discloses "capturing a view" regardless of whether Gamecaster's construction is the broadest reasonable construction: "While Patent Owner's argument revolves around the interpretation of the claim term 'capturing,' we find that whether the term is defined as (1) only 'obtaining' images or (2) as 'obtaining and storing or recording' images is irrelevant for the obviousness rejection over these claims to be valid." A6. The Board found that "regardless of the definition of 'capturing,' . . . the evidence supports that it would have been obvious to one of ordinary skill in the art that Paley teaches obtaining images and storing them in temporary files and/or long term storage." A7.

The Board pointed to three ways in which Paley teaches storing images. First, Paley "describes a display of a real-time preview and a device an animator uses to control animation previews in order to edit them," and "one of ordinary skill in the art would have used these devices together," particularly because the Cyclops device "was designed for an animation director." A7. Using these devices together, "the views from the display device are fed into the animation program workplace and stored so that the images can be edited at a later time." A7. Second, even without any specific disclosure in Paley, "it was well-known at the time of the invention for computer animation scenes to be obtained and recorded for subsequent processing, editing, and viewing." A7. And third,

because the images are displayed on the real-time display, "the images are inherently stored long enough to generate a preview such that the images were stored either in 'a frame buffer memory, input/output buffer, cache memory, Random Access Memory.'" A7.

***Movement sensors.*** The Board also found that both Paley and Vincent disclose the recited movement sensors. The Board explained that "since Paley teaches the use of potentiometers, . . . Paley teaches the movement sensors." A8. Indeed, "the '220 patent specifically provides an example where potentiometers are used for this purpose." A8. Moreover, the Board rejected Gamecaster's argument that "Paley's system cannot measure the position of the apparatus with respect to its environment and, thus, does not teach the required movement sensors." A8. The Board reasoned that the "Specification does not require this definition, but rather states that any sensor that measures 'relative displacement in any type of direction' can be used with the invention." A8.

In any event, even if Paley does not disclose the recited movement sensors, the Board found that Vincent does:  "Vincent teaches accelerometers and gyroscopes to determine angular rates and acceleration of a camera device." A9. The Board rejected Gamecaster's argument "that Vincent cannot be used with Paley because Vincent is used for real world cameras and not a virtual environment." A9. According to the Board, "the combination of Vincent's

gyroscopes and accelerometers with Paley's camera is nothing more than combining familiar elements according to known methods in order to yield predictable results." A9.

## SUMMARY OF ARGUMENT

I.     Substantial evidence supports the PTO's finding that Paley teaches "a virtual camera capturing a view within a virtual environment," even under Gamecaster's construction of "capturing," which would require that the views be stored or recorded. Paley indicates that views obtained by the Cyclops are or can be fed into an animation program where they are stored to be played back or edited. Even without that indication in Paley, it was well known at the time of the invention for computer animation scenes to be recorded. Moreover, Paley states that the views of the virtual environment obtained by the Cyclops are displayed in real time, which necessarily means that the views are stored long enough for the preview to work.

Alternatively, the "capturing a view" limitation is disclosed because the broadest reasonable construction of that limitation does not require that views be stored or recorded. The specification indicates that "capture" includes simply collecting, extracting, or obtaining the views of the virtual environment without necessarily storing or recording those views. For instance, the specification indicates that "capturing a view" of a virtual environment means something similar

23

to the use of a real-world camera, and there are many uses of real-world cameras to capture views without recording or storing the views. Gamecaster's narrow construction also is inconsistent with the broadest reasonable construction because it would render the scope of independent claim 17 narrower than what was clearly intended to be the scope of dependent claim 22. Gamecaster makes a supposed claim-differentiation argument, but that argument is waived and, in any event, is misplaced, as it compares independent claims against each other rather than an independent claim against a dependent claim. Moreover, Gamecaster's extrinsic evidence cannot narrow the scope of the claims in the face of intrinsic evidence that supports a broader reading.

II.    Substantial evidence also supports the PTO's finding that Paley discloses the claimed movement sensors. Gamecaster argues that Paley does not disclose the recited movement sensors because the movement sensors in the claims must provide for angular rate or angular acceleration signal generation, whereas the Cyclops's potentiometers do not so provide. But as a matter of claim construction, the PTO concluded that the claimed movement sensors need only measure relative displacement, and Gamecaster does not challenge that construction. Because the Cyclops's potentiometers measure relative displacement, they are the movement sensors claimed in the '220 patent.

Even if Paley did not teach the recited movement sensors, it would make no difference because they are taught by Vincent, and it would have been obvious to a person of skill in the art to use them with the Cyclops. Vincent teaches accelerometers and gyroscopes, which the '220 patent specification states are examples of the claimed movement sensors. Gamecaster asserts that a person of skill in the art would not have been motivated to combine Paley and Vincent because Paley operates in a virtual environment while Vincent operates in a real-world environment. But substantial evidence supports the PTO's contrary finding. Gyroscopes and accelerometers were familiar tools and widely used with video cameras. The Paley article specifically states that the developers of the Cyclops looked for familiar real-world camera tools to use on the Cyclops because that made the Cyclops more intuitive to use. A person of skill in the art would have known to use gyroscopes or accelerometers in place of the Cyclops's potentiometers.

III.   Gamecaster also argues that neither Paley nor Vincent discloses a "virtual environment being generated without images captured by a camera with an image sensor." But this is plainly disclosed in Paley. Paley expressly states that the Cyclops has a flat-panel display in the place of a camera with an image sensor. Indeed, Paley is clear that the Cyclops is a tool for viewing the action of computer

animation, which is by definition a virtual environment, not an environment generated by a camera with an image sensor.

## STANDARD OF REVIEW

Obviousness is a question of law that this Court reviews de novo, but it rests on factual determinations that this Court reviews for substantial evidence. *In re Teles AG Informationstechnologien*, 747 F.3d 1357, 1368 (Fed. Cir. 2014); *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012). A factual finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). A claim is invalid for obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a) (2006).

Claim construction by the PTO is a legal question that is reviewed de novo. *C.W. Zumbiel Co. v. Kappos*, 702 F.3d 1371, 1381 (Fed. Cir. 2012); *see Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1276–1277 (Fed. Cir. 2014) (en banc); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1373 (Fed. Cir. 2013), *cert. granted*, 134 S. Ct. 1761 (2014). The PTO must "give[] claims the broadest reasonable interpretation consistent with the written description." *In re Baker Hughes Inc.*, 215 F.3d 1297, 1301 (Fed. Cir. 2000).

26

## ARGUMENT

### I.  PALEY TEACHES "A VIRTUAL CAMERA CAPTURING A VIEW WITHIN A VIRTUAL ENVIRONMENT"

Independent claims 17, 24, and 42 each recite "a virtual camera capturing a view within a virtual environment."  A53 (col.29:52–53) (claim 17); A54 (col.31:23–25) (claim 24); A54 (col.33:31–33) (claim 42).  The PTO correctly found that the Cyclops captures a view within the animated, virtual environment.  According to Gamecaster, that finding was erroneous because "capturing" requires not only obtaining or extracting a view but also storing or recording it.  Gamecaster Br. 25–29.  But the PTO found that even if Gamecaster's construction were the broadest reasonable construction, it would not matter because Paley teaches capturing a view even under that construction.  Substantial evidence supports that factual finding.  And in any event, the broadest reasonable construction of "capturing" does not require storing or recording.

#### A.  Substantial Evidence Supports The PTO's Finding That, Even Under Gamecaster's Construction Of "Capturing," Paley Teaches "Capturing A View"

As the PTO found, Paley teaches a virtual camera storing or recording a view.  That is so for at least three independent reasons.

### 1.   *Paley indicates that the views obtained by the Cyclops are recorded or stored by an animation program*

First, Paley indicates that views obtained by the Cyclops are or can be fed into an animation program where they are stored to be played back or edited by an animation director at a later time.   A7.   According to Paley, the Cyclops is a special-purpose input device, indicating that the information obtained through the virtual camera is obtained to be input and stored on the computer.   A1095, A1101. Specifically, as the user directs the virtual camera to "follow some action" in an animation sequence (A1100), the Cyclops inputs information about the camera angles into an animation program, which constructs a view of the virtual environment and displays it on the Cyclops's flat-panel display.   A1100–A1101. An animation program would store the views obtained by the Cyclops's virtual camera so that they may be replayed or edited at a later time.   Indeed, Paley's description of the Cyclops's flat-panel display as "displaying a real-time *preview* of the animation" (A1101 (emphasis added)) indicates that what is displayed is a preview of what is simultaneously being recorded for later processing, editing, viewing, and so forth in a computer-animation program.

In fact, in the very next paragraph following Paley's discussion of the Cyclops, Paley describes an animation program that can be used to edit or play back a recorded animation sequence:

> Likewise, the User Interface Research Group at Alias|Wavefront has tapped into decades of training and development in editing by simulating a standard jog/shuttle wheel. They gave the animator a puck-like input device to control animation previews the way a video editor controls tape replay. This device allows easy forward and backward motion through the animated sequence with simple and familiar turning motions, and single-frame moves with related motions.

A1101.

Gamecaster argues that there is no substantial evidence to support the PTO's finding that the views obtained by the Cyclops can be fed into an animation program for later viewing and editing because, according to Gamecaster, Paley "doesn't call for/suggest using the Cyclops device with the so-called editing device that PaleyArticle refers to." Gamecaster Br. 12. But that is not so. Immediately after discussing the Cyclops and the animation-editing tool, Paley states: "We can easily imagine an animation workplace set up with several devices, each giving instantaneous access to a different function, allowing the animator to work with his body." A1101–A1102. That is, the devices discussed in Paley could be used in conjunction with each other as part of an animation workplace. Indeed, the Paley article suggests that the individual tools could be part of a computer animator's "toolbox." A1100. Paley stresses that "[h]aving several devices," such as the Cyclops and the animation-editing tool, "can act as an aid to the user in conceiving how to accomplish a goal." A1102.

Gamecaster also argues that there is no evidence that the specific animation-editing tool discussed in Paley is actually "used in, or useful for, video editing" but rather that it is useful simply for "an animator to control animation previews." Gamecaster Br. 13–14. But whether this specific tool is used to *edit* animation sequences makes no difference. According to Paley, the animation program "allows easy forward and backward motion through the animated sequence." A1101. The fact that the animation tool can fast-forward or rewind through an animation sequence means that the sequence has been recorded—i.e., captured, even under Gamecaster's construction. Because that animation tool can be used together with the Cyclops, there is substantial evidence that the views captured by the Cyclops can be recorded or stored in the animation tool.

And in any event, apart from the specific animation-editing tool that Paley expressly discusses, Paley also refers to other animation programs that are known in the art that would store or record the inputs from the special-purpose input devices discussed in the article. For example, another input device discussed in Paley, known as the "Monkey," is used to input "key frames" in the animation sequence. A1100. The Monkey does not "creat[e] all of the in-between frames: that[']s left for the animation program." A1100. In other words, an animation program referred to in Paley is able to sequence together individual frames that

were input into the program by the input devices. That is possible only if the animation program stores or records the views obtained by the input devices.

That is more than enough evidence to support the PTO's finding that Paley discloses "capturing a view." This Court need go no further to affirm that finding.

### 2. It was well known in the art that animation scenes would be recorded for later editing, processing, and viewing

Second, even without any of the above disclosures in Paley of animation-editing tools that would store or record the views obtained by the Cyclops, the PTO found that at the time of the alleged invention in 2004, "it was well-known . . . for computer animation scenes to be obtained and recorded for subsequent processing, editing, and viewing." A7. As the PTO found, "cameras are known devices that are used to capture and store images." A7. The Cyclops device is a virtual video camera mounted on a tripod, and as such the concept of recording the scenes obtained by the Cyclops virtual camera was well understood by persons skilled in the art.

Indeed, Paley states that the Cyclops was developed for "computer animation director Steve Katz." A1101. That suggests that the Cyclops device was designed to extract and record animation clips for an animation director. An animation director's role would be to oversee editing and processing of the clips to produce an animated movie or video. Doing so would require recording of the view obtained by the Cyclops so that the clip could be recalled at a later time.

31

Gamecaster does not challenge the PTO's finding that it was well known in the art that animation scenes would be recorded. Gamecaster has therefore waived any challenge to that finding. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived."). This is an independent reason to affirm the PTO's finding that Paley teaches "capturing a view."

### 3. The Cyclops's display of real-time previews of the view captured by the Cyclops necessarily involves storing or recording the view

Third, even apart from any animation software that would record the views, the Cyclops's real-time preview necessarily would require storing or recording the images to some extent. The PTO found that for the Cyclops display to work as described in Paley, "images are inherently stored long enough to generate a preview" in the Cyclops flat-panel display. A7.

According to Paley, the Cyclops device had a flat-panel display mounted on the tripod where a camera would normally go. A1101. Paley states that the device feeds the virtual camera's tilt and pan angles into the animation program and that the device "display[s] a real-time preview of the animation." A1101. The PTO found that for that process to work, images would have to be "stored either in a frame buffer memory, input/output buffer, cache memory, Random Access Memory (RAM), etc." A7 (internal quotation marks omitted). That is, the act of

displaying the viewpoint of the virtual environment by the Cyclops via the flat-panel monitor, at the very least, evidences that the virtual environment was captured and recorded long enough to generate the displayed view.  *See* A747–A748.

Gamecaster's only response to this is that Paley does not *explicitly* "state that Cyclops could store, or did store any image, even for an instant."  Gamecaster Br. 17 (emphasis omitted).  According to Gamecaster, "[o]nly if Cyclops always and invariably stored images" could the PTO "properly find that Cyclops inherently stores images," *but* "*the PaleyArticle does not say Cyclops does so*."  *Id.* (emphasis added).  In other words, Gamecaster argues that *inherent* disclosure requires the prior art reference to *expressly* disclose the limitation.  But that conflates inherent and express disclosure.  Claim limitations may be disclosed "either expressly or inherently."  *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1343 (Fed. Cir. 2010) (internal quotation marks omitted).  Where a limitation is disclosed inherently, it is by definition not express.

Here, the PTO found that "images are inherently stored long enough to generate a preview."  A7; *see* A747–A748.  The PTO was entitled to use its expert knowledge in the art to find that the disclosure of a flat-panel display showing a real-time preview necessarily must involve the storing of images for at least a brief amount of time, even if Paley did not expressly state that images were stored.  The

PTO's findings, in light of its technical expertise, are entitled to deference. *Dickinson v. Zurko*, 527 U.S. 150, 160 (1999) ("[T]he PTO is an expert body" that "can better deal with the technically complex subject matter," and "the PTO consequently deserves deference."). Gamecaster's argument would require that Paley—an article describing an innovative virtual camera—would also have needed to explain the details about how flat-panel displays work and that they necessarily store images at least for a very brief amount of time, even though that technology was well known and was not the focus of the article. Such a requirement would amount to precisely the type of "[r]igid preventative rules that deny factfinders recourse to common sense" that the Supreme Court has rejected. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). The PTO's finding is supported by substantial evidence and should be affirmed.

### B.    Alternatively, Paley Teaches The "Capturing A View" Limitation Under The Broadest Reasonable Construction Of "Capturing"

Even though the Board did not reach it, Gamecaster also challenges the Examiner's construction of "capturing" as not requiring storing or recording of images. Gamecaster Br. 25–29. Gamecaster argues that this is a "separate and independent ground" for reversal. Gamecaster Br. 25. That is incorrect: adoption of Gamecaster's construction would not alone be grounds for reversal because the PTO accepted *arguendo* Gamecaster's construction and rejected the '220 patent claims even under that construction. A7. In fact, the Examiner's construction of

34

"capturing" is an alternative reason to affirm. The broadest reasonable construction of "capturing a view" includes extracting or obtaining a view within a virtual environment without necessarily recording or storing. This meaning is consistent with the claims and specification, and nothing in the intrinsic evidence suggests that a more restrictive construction should be adopted.[1]

### 1. The specification is consistent with "capturing" a view without necessarily recording or storing it

Other than the use of "capturing" in the claims, the term "capture" is used in only one place in the specification, and that use is consistent with not requiring storing or recording of the video:

> In one embodiment, the video camera component is designed to provide video capture from within the virtual environment that emulates very closely video capture from real world events. Accordingly, the video camera component may permit a professional motion picture camera person to extract views and employ devices recognized in the motion picture art resulting in video images of virtual environments having the attributes of video capture of real world events.

---

[1] Although the Board did not reach the claim construction, this Court may affirm on the alternate ground that "capturing" does not require storing or recording. Claim construction is purely legal and does not require any further factual development. *In re Aoyama*, 656 F.3d 1293, 1299 (Fed. Cir. 2011) ("'[W]e may, however, where appropriate, affirm the agency on grounds other than those relied upon in rendering its decision, when upholding the agency's decision does not depend upon making a determination of fact not previously made by the agency.'" (quoting *In re Comiskey*, 554 F.3d 967, 974 (Fed. Cir. 2009))).

A39 (col.2:33–40).   This description indicates that "capture" means to collect, extract, or obtain the views of the virtual environment similar to what a real-world camera would do, but the description does not suggest that "capture" is limited to meaning extract *and record*.   As the Examiner explained, "the specification never appears to disclose the captured view is actually recorded as proposed by Patent owner."  A734–A735.

To be sure, certain real-world cameras may "capture images by recording/storing those images, on film, or digitally" (Gamecaster Br. 27), but that is only one way to capture images.   Real-world video cameras may be used in other ways to capture views without recording.   For example, a digital video recorder or digital camera typically includes a preview display screen, which can display a preview of the images "captured" by the device without necessarily being in a record mode or saving an image to a storage device.   A734.   Further, a real-world video camera transmitting a live sporting event or television show is not necessarily storing the video feed on film, tape, or memory device.   Additionally, a camera may capture and transmit the video feed of a live event, such as a courtroom trial, that is being broadcast live only on closed-circuit television to individuals watching the event who could not be there in person, such as members of the public in an overflow courtroom who could not fit into the courtroom where the trial is occurring.   Such a live broadcast does not necessarily involve recording

the video feed; indeed, there may be good reasons that it would be desirable *not* to record the video feed. Gamecaster's construction—supposedly based on what real-world cameras do—does not account for such actual uses of real-world video cameras.

Other parts of the specification indicate that the '220 patent contemplates uses of the virtual camera to capture views of the virtual environment without necessarily recording them. For instance, the '220 patent describes that the alleged invention allows "fans and aficionados" of video games to become "a third-party viewer of the game" and to "move within the virtual environment of the video game as an observer of the play action." A39 (col.1:57–61); *see* A39 (col.2:18–22). The specification also describes certain embodiments for use within a Gamecaster Cybercam facility, where each camera person therein can set in real time his or her video camera component to display or permit viewing of one or more perspective views from within the video game. A47–A48 (col.18:49–col.19:8). Nothing in the specification indicates that individuals who are merely watching a video game being played are necessarily recording as they are watching. Moreover, the specification is replete with descriptions of a cameraperson using an embodiment merely for "viewing of image perspectives" of the virtual world, i.e., obtaining or extracting the view without necessarily

recording or storing the extracted image perspectives. A49 (col.21:32–44, col.22:50–55).

Gamecaster cites portions of the specification that recite a list of acts that include "storing," suggesting that this means that "capturing" must require "storing." Gamecaster Br. 28. In particular, the specification states: "In one or more embodiments, components are provided for generating, reviewing, processing, storing, retrieving, analyzing, and optimizing information input to or output from a virtual environment." A39 (col.2:10–13); *see also* A39 (col.2:63–66) ("disclosed embodiments can be used to extract, process and store delayed-time or real-time inputs to and outputs from video film taken from within an individual's body"). But these examples list "storing" as a separate act from generating or retrieving a view of the virtual environment and thus fail to define "capturing" as requiring both extracting and storing.

### 2. *Gamecaster's construction of "capturing" would render independent claims narrower than certain of their dependent claims*

The Examiner also correctly rejected Gamecaster's construction because it would render the scope of independent claim 17 narrower than what was clearly intended to be the scope of dependent claim 22. A735–A736. Claim 22, which depends from claim 17, recites that the virtual environment may comprise "a computer aided design (CAD) or computer aided manufacturing (CAM)

application"; a "holography application"; a "medical analysis or surgical analysis application"; "flight simulation training applications"; "modeling simulations for biological," "chemical," or "molecular analyses applications"; and so forth. A53–A54 (col.30:60–col.31:11).

These claimed virtual environments do not lend themselves to a device that requires that the virtual views be extracted and recorded. Rather, they suggest camera control input devices and virtual cameras capturing views solely for real-time viewing. For example, if the virtual environment is a flight simulation training application, the alleged invention would be used for pilot training. The pilot or a third-party observer would use the alleged invention to navigate through the virtual airspace. But while using a flight simulator, the real-time views of the virtual airspace are not necessarily recorded. Thus, the flight-simulation training application and other examples listed in claim 22 strongly suggest use of the invention for real-time viewing, not viewing that necessarily involves recording.

Requiring recording in independent claim 17 would therefore make that claim narrower than dependent claim 22, even though an independent claim

necessarily embraces more subject matter than its narrower dependent claim. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314–1315 (Fed. Cir. 2005) (en banc).[2]

### 3. *Gamecaster's claim-differentiation argument is waived and, in any event, is without merit*

Gamecaster argues that "the doctrine of claim differentiation supports [its] definition of 'capturing'" because the "appealed claims call for capture of images in a virtual environment," while the "non-appealed claims do not call for capture/recording/storage of such images." Gamecaster Br. 28. Gamecaster does not explain, however, how the presence of the word "capturing" in the appealed claims and its absence in the non-appealed claims somehow means that "capturing" must include not only obtaining or extracting a viewpoint but also recording or storing it. Gamecaster's terse assertion, without any attempt at explanation or a developed argument, is not sufficient to preserve an argument under well-established appellate rules. *SmithKline Beecham*, 439 F.3d at 1319–1320; *see also Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)).

---

[2] Although Gamecaster did not appeal the Examiner's rejection of independent claim 1 and dependent claim 3, the same concern applies to those claims. A735.

In any event, Gamecaster's claim-differentiation argument has no merit. Under the doctrine of claim differentiation, "the presence of a *dependent* claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the *independent* claim." *Phillips*, 415 F.3d at 1314–1315 (emphasis added). The doctrine is thus "most commonly applied 'when there is a dispute over whether a limitation found in a *dependent* claim should be read into an *independent* claim, and that limitation is the *only meaningful difference* between the two claims.'" Chisum on Patents § 18.03 (emphasis added) (quoting *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001)); *see Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) ("Thus, the claim differentiation tool works best in the relationship between independent and dependent claims."). Here, Gamecaster is comparing independent claims. When applied to two independent claims, "claim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous." *Curtiss-Wright*, 438 F.3d at 1381. But Gamecaster does not argue that a broader construction of "capturing" in the appealed claims would render any language in the non-appealed claims superfluous. The claim-differentiation doctrine therefore does not apply.

Moreover, Gamecaster's brief misquotes non-appealed claim 34. Gamecaster states that claim 34 "calls for '...the virtual camera control signal

interpretable by a software application as an instruction for changing (*but not for capturing*) a view within a virtual environment that is entirely generated by the software application.'" Gamecaster Br. 28 (emphasis added). But the parenthetical "(but not for capturing)," despite being within quotation marks in Gamecaster's brief, is not actually present in claim 34; it was added by Gamecaster. A54 (col.32:35–39).

### 4. *None of Gamecaster's extrinsic evidence narrows the meaning of "capturing"*

Gamecaster points to dictionary definitions that purportedly use "capture" to mean "record." Gamecaster Br. 28–29. But the abstract meaning of "capture" in a general-purpose dictionary is not the proper inquiry; the question is the meaning of "capturing" within the context of the patent. *Phillips*, 415 F.3d at 1321. As this Court has warned, "reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Id.* That risk is particularly acute here because the dictionary definitions to which Gamecaster points refer to the use of computers to capture data, not to the use of video cameras to capture a viewpoint. Gamecaster Br. 28. These abstract dictionary definitions are therefore not informative and cannot overcome the intrinsic evidence, which does not support Gamecaster's narrow construction.

In any event, the cited dictionary definitions are inconsistent with Gamecaster's construction. One of the definitions of "capture" in the Merriam-Webster Online Dictionary is "the act of recording in a *permanent* file <data capture>." Merriam-Webster Online Dictionary, http://www.merriam-webster. com/dictionary/capture (emphasis added). Not even Gamecaster construes "capture" as requiring *permanent* storage. And the Dictionary.com definition refers to entering data into a computer "for processing *or* storage," meaning that storage is not required for data to have been captured. Dictionary.com, http:// dictionary.reference.com/browse/capture (emphasis added).

Gamecaster also points to the user manuals of three video-editing software applications. Gamecaster's argument consists of a single sentence and an undifferentiated citation to some 40 pages of material. Its brief provides no explanation of how these extrinsic documents supposedly support its construction. That argument is not developed and therefore is waived. *SmithKline Beecham*, 439 F.3d at 1319–1320. In any event, this extrinsic evidence cannot overcome the intrinsic record, which is a superior guide to the meaning of claim terms and which here does not limit the meaning of "capture" to require storage. *Phillips*, 415 F.3d at 1319 ("undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history" (internal

quotation marks omitted)).    Moreover, the user manuals were written for consumers, not for skilled artisans in the field of virtual systems, and therefore cannot overcome the intrinsic evidence.    Even if these manuals were instructive, they do not define "capturing" to require recording; rather, they use "capturing" to mean obtaining, while allowing for the possibility that a video clip that has been captured may also be saved into long-term storage.    *See* A920–A921.

\*    \*    \*

As the Examiner correctly concluded, the broadest reasonable construction of "capturing" means obtaining or extracting a viewpoint but does not require that images be recorded or stored.    It is undisputed that Paley teaches obtaining or extracting a viewpoint in a virtual environment.    Accordingly, this is an alternative basis to affirm the PTO's finding that Paley teaches "capturing a view."

## II.    SUBSTANTIAL EVIDENCE SUPPORTS THE PTO'S FINDING THAT THE CLAIMED MOVEMENT SENSORS ARE DISCLOSED BY PALEY OR BY PALEY IN VIEW OF VINCENT

Independent claims 17, 24, and 42 each require movement sensors—i.e., horizontal and vertical sensors configured to provide horizontal and vertical movement signals.    Substantial evidence supports the PTO's finding that Paley discloses the recited movement sensors.    Substantial evidence also supports the PTO's alternative finding that Vincent discloses the movement sensors and that it

would have been obvious to a person of skill in the art to use those sensors with Paley's Cyclops device.

### A.    Paley Discloses The Recited Movement Sensors

Gamecaster's challenge to the PTO's finding that Paley discloses the recited movement sensors appears to be as follows:  the movement sensors in the claims purportedly must provide for angular rate or angular acceleration signal generation, yet a declaration by W. Bradford Paley supposedly admits that the Cyclops device did not provide for angular rate or angular acceleration signal generation. Gamecaster Br. 18.

As a matter of claim construction, however, the PTO rejected the first part of Gamecaster's argument.  The PTO concluded that "any sensors known in the art that are used to measure *relative displacement* can be used with the invention."  A8 (emphasis added).  It is not necessary for the sensors to measure angular rate or angular acceleration.  In so concluding, the PTO correctly relied on a passage from the specification explaining that "[a]s known to skilled persons, however, any combination of sensors may be used to measure *relative displacement* in any type of direction."  A50 (col.24:41–44) (emphasis added).  Indeed, claim 17 states that the sensors are "configured to provide" movement signals "in accordance with" angular acceleration or angular rate.    A53  (col.29:63–66, col.30:5–8).    The broadest reasonable construction thus is not limited to sensors that directly measure

angular acceleration or angular rate, to the exclusion of sensors that measure relative displacement, which may be used "to provide" acceleration and rate.

The only semblance of an argument that Gamecaster makes to challenge that construction is as follows: "The PTABOrder's reliance on arguably broader language about sensors in the '220 patent specification at column 23:67–24:1 and at 24:41–44 is misplaced." Gamecaster Br. 18. That single sentence, however, is not sufficient to challenge the PTO's claim construction, and any such challenge is therefore waived. *SmithKline Beecham*, 439 F.3d at 1319–1320. Moreover, Gamecaster's brief explicitly states that Gamecaster is challenging only whether there is "Substantial Evidence to Support" the Board's factual "Finding" concerning the movement sensors, as opposed to the construction of the recited movement sensors. Gamecaster Br. 18. Accordingly, the Board's construction— requiring only sensors that measure relative displacement—controls.

The PTO's unchallenged claim construction is fatal to Gamecaster's remaining arguments about the movement sensors. Under the PTO's construction, there is overwhelming evidence that Paley teaches movement sensors. As the Board observed, the '220 patent's specification explains that relative displacement may be measured by potentiometers. A8; A50 (col.24:50–55). It is undisputed that the Cyclops device included pan and tilt potentiometers, one for generating a motion signal associated with the pan (i.e., horizontal movement) of the tripod and

one for generating a motion signal associated with the tilt (i.e., vertical movement) of the tripod.  A8; A1172–A1173.  Because the Cyclops was instrumented with horizontal and vertical potentiometers that send movement signals based on the relative horizontal and vertical displacement, those potentiometers are movement sensors under the PTO's unchallenged construction.

Nor is Gamecaster right even under its own desired construction. Gamecaster's only argument concerning the purported lack of movement sensors in the Cyclops device is based on a declaration by Mr. Paley discussing the Cyclops.  A1171–A1175.  Paley's declaration states:

> 7.    As designed and built, the Cyclops device provided signals based on the angular position of the device (*e.g.*, pan and/or tilt) and other user input controls (*e.g.*, the linear potentiometer for zooming) to a computer in order to control a virtual camera within a computer animated environment generated entirely by software and without images captured by an image sensor.

> 8.    We could have readily determined the angular rate or angular acceleration from the angular positional information described above.  This could have been done easily using the above signals by calculating changes in angular position over time.  I also considered using gyroscopes and/or accelerometers in place of the potentiometers, but ultimately chose to use potentiometers as a matter of design choice and to obtain the level of precision in measurements we desired for the Cyclops.

A1173.

Gamecaster asserts that the declaration "admits that Cyclops did *not* provide for angular rate or angular acceleration signal generation." Gamecaster Br. 18. Not so: the declaration states that the potentiometers provided all the information necessary for angular rate or angular acceleration and that determining rate or acceleration was a matter of a simple calculation. A1173.

More to the point, whether Paley's declaration admits that the Cyclops did not measure angular rate or angular acceleration does not matter. The PTO construed the movement sensor limitations as *not* requiring angular rate or angular acceleration measurement. A8. That construction is unchallenged. Accordingly, the PTO's finding that Paley teaches the recited movement sensors should be affirmed.

## B. The Claimed Movement Sensors Are Disclosed By Vincent, And It Would Have Been Obvious To Use Them With Paley's Cyclops

Even if Paley did not teach the recited movement sensors, it would make no difference because they are taught by Vincent, and it would have been obvious to a person of skill in the art to use them with the Cyclops. A9.

Vincent plainly teaches the recited movement sensors. As the Board found, "Vincent teaches accelerometers and gyroscopes to determine angular rates and acceleration of a camera device." A9 (citing A1114, A1145 (col.5:16–35)). The '220 patent expressly provides that accelerometers and gyroscopes are examples of the recited movement sensors. A50 (col.24:33–41). Indeed, because

accelerometers and gyroscopes can measure angular rates and acceleration, they are movement sensors even under Gamecaster's construction. Gamecaster nakedly asserts in a single sentence that it was "Erroneous" for the PTO to find that Vincent's disclosure of accelerometers and gyroscopes amounts to teaching movement sensors. Gamecaster Br. 19 ("Erroneous Finding 5 states: To a PHOSITA, VincentPat teaches using accelerometers and gyroscopes to determine angular rates and angular acceleration of a camera."). Not only is that sentence wrong, is not sufficient to challenge the PTO's finding. *SmithKline Beecham*, 439 F.3d at 1319–1320.

The real thrust of Gamecaster's argument is that a person of skill in the art would not have been motivated to equip Paley's Cyclops device with the accelerometers and gyroscopes disclosed in Vincent. Gamecaster Br. 19–20. According to Gamecaster, there would have been no motivation to combine elements from Vincent with Paley, even though both describe a camera control device, because Vincent operates "in a real world environment" and Paley operates in a "virtual environment." *Id.* at 19.

But substantial evidence supports the PTO's finding that "the combination of Vincent's gyroscopes and accelerometers with Paley's camera is nothing more than combining familiar elements according to known methods in order to yield predictable results." A9; *see KSR*, 550 U.S. at 416. Accelerometers and

49

gyroscopes were not unique to Vincent; they were well known in the art.  A751.
Vincent did not invent accelerometers and gyroscopes; he invented a camera
device that records not only images but also information about the camera's
position.  Vincent just happened to instrument his invention with accelerometers
and gyroscopes, both of which were widely known in the art, as tools to measure
angular rates and acceleration.  The PTO pointed to Vincent's disclosure of
accelerometers and gyroscopes not because there was anything special about
Vincent's accelerometer and gyroscope, but rather merely to demonstrate that
accelerometers and gyroscopes were "familiar elements" in the art that could serve
as movement sensors.  A9; A749–A751.

Thus, the fact that Vincent's invention was a real-world camera and that the
Cyclops was a camera-simulating device does not undermine the PTO's
obviousness rejection.  What mattered to the PTO's obviousness analysis was
simply the undisputed fact that gyroscopes and accelerometers were familiar tools
and widely used with video cameras—Vincent being just one example showing
that.  Someone of skill in the art would have been motivated to use such already-
familiar tools to equip a camera-simulating device.

Indeed, Paley expressly states that it would be advantageous to equip
special-purpose input devices, including the Cyclops, with tools that were already
well known to persons who use real-world cameras.  The Cyclops was built using a

"standard fluid-head tripod" and a "flat-panel display," A1101, both of which are widely known to those skilled in the art. Paley states that the use of known camera controls was intentional. A1101. Using already-familiar camera controls makes the device "completely intuitive to use, and one that taps into years of experience that a cinematographer may have acquired on the somatic level." A1101. It thus would have been obvious to equip the Cyclops with other well-known camera controls, including an accelerometer and a gyroscope. *See KSR*, 550 U.S. at 418 ("[A] court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."). Thus, there are substantial reasons for combining Paley and Vincent.

Gamecaster argues that "[n]owhere does the VincentPat teach or imply that his sensors or his device could/should be used with a virtual camera." Gamecaster Br. 19. But it does not matter whether Vincent expressly states that accelerometers and gyroscopes could be used with a virtual camera. The relevant inquiry is whether it would have been obvious to a person skilled in the art to equip the Cyclops device with accelerometers and/or gyroscopes—i.e., to use well-known components for controlling a real-world camera with Paley's virtual camera. *See KSR*, 550 U.S. at 416–417. As discussed above, it would have been an obvious design choice.

Gamecaster asserts there would have been no motivation because Vincent uses these sensors only to record information about the camera's position, whereas Paley does not disclose that camera position or motion is recorded. Gamecaster Br. 20. But even if the accelerometer and gyroscope are used slightly differently in Vincent than they would be in Paley, that would not defeat Paley's teaching that already-familiar objects (such as accelerometers and gyroscopes) should be used. Moreover, they are used in both Vincent and Paley in the same way: in Vincent, the camera position and orientation are recorded and used later to compute the distance to the subject in an image (A1112) and thus to control the placement of a viewpoint, just as in Paley.

Gamecaster's brief includes five pages of charts comparing Paley and Vincent against the elements of the '220 patent claims, and asserting that because several elements purportedly are absent from Paley and Vincent, "it would have been unobvious to combine what is disclosed in PaleyArticle with what is disclosed in VincentPat." Gamecaster Br. 20 (emphasis omitted); *see id.* at 21–25. For the most part, the elements that are alleged to be absent from Paley and Vincent are the same elements that the PTO expressly found *are* present in Paley and/or Vincent—e.g., a virtual camera capturing a view and the recited movement sensors. Gamecaster's conclusory statements that those elements are missing are wrong. *See supra* Parts I.A, II.A; *infra* Part III. Even if those assertions were true,

they do not show why it would not have been obvious to combine Paley's Cyclops with accelerometers and gyroscopes, particularly where the thrust of the Paley article is the use of real-world camera tools in an animated/virtual environment.

To the extent that Gamecaster's charts suggest that other elements also are not disclosed in Paley or Vincent, the charts' conclusory statements are insufficient to amount to an appellate argument. *SmithKline Beecham*, 439 F.3d at 1319–1320. Moreover, certain of those suggestions were not made before the Board below. For instance, Gamecaster alleges that "PaleyArticle doesn't disclose a device for controlling a virtual camera." Gamecaster Br. 21 (emphasis omitted). But Gamecaster never made that argument before the Board. A878–A888. Consequently, it is waived. *In re Baxter Int'l, Inc.*, 678 F.3d at 1362.

Finally, Gamecaster relies on the declaration of Edward L. Gussin (A1176–A1179) to demonstrate that a skilled artisan would not have been motivated to combine Paley's Cyclops with Vincent's accelerometer and gyroscope. Gamecaster Br. 6–7, 20. According to Gamecaster, "Gussin's expert testimony is unrebutted by any record evidence." *Id.* at 20 (emphasis omitted). But the Examiner gave the Gussin declaration no "evidentiary weight" because the declaration lacked the oath required by 37 C.F.R. § 1.68. A764–A765. In any event, the Gussin declaration at most merely repeats in conclusory fashion the

53

arguments in Gamecaster's brief.  A1179.  Gussin's declaration is wrong for the same reasons Gamecaster's brief is wrong.

In sum, there is more than enough evidence to support the PTO's factual findings that Paley alone or in combination with Vincent discloses the recited movement sensors.

## III. PALEY TEACHES A "VIRTUAL ENVIRONMENT BEING GENERATED WITHOUT IMAGES CAPTURED BY A CAMERA WITH AN IMAGE SENSOR"

Gamecaster also argues that neither Paley nor Vincent discloses a "virtual environment being generated without images captured by a camera with an image sensor."  Gamecaster Br. 7–8, 29–31; *see* A53–A55 (col.29:54–56, col.31:27–28, col.33:35–36).

But this limitation is plainly disclosed in Paley.  Paley expressly states that the Cyclops has "a flat-panel display on the tripod where the camera would normally go."  A1101.  The Cyclops thus lacks a camera having an image sensor; the camera is replaced by the flat-panel display.  The flat-panel display shows "a real-time preview of the animation," which is generated by an "animation program," not by a camera with an image sensor.  A1101; *see also* A1173 (Cyclops was designed "to control a virtual camera within a computer animated environment generated entirely by software and without images captured by an image sensor.").  Indeed, Paley is clear that the Cyclops is a tool for viewing the

action of computer animation.  A1100–A1101.  An animated environment is, by definition, a virtual environment generated through drawing, computers, etc., not a real-world environment capable of being captured by a camera with an image sensor.  Gamecaster does not dispute that.

Instead, Gamecaster quotes from the Paley article's discussion of a *different* special-purpose input device called the Monkey, asserting that that discussion "calls for imaging real world images."  Gamecaster Br. 8 (emphasis omitted).  The Monkey was an input device used to aid in computer animation of a human figure with appropriate proportions and posture.  As Paley explained, artists outside the computer-animation context had long used wooden models to aid in drawing and painting humans.  A1098 ("Moving an articulated model into a posture has been done by art students for ages . . . .").  The Monkey was "essentially an electronic version of that wooden artist[']s model, instrumented with sensors, that can control an on-screen human model."  A1099.  Rather than using a keyboard and mouse to manipulate the animated human figure in a particular frame, the animator could simply move the Monkey.  A1099.  The sensors on the Monkey would feed the Monkey's position into the animation program.  A1099–A1100.

Gamecaster's reliance on Paley's discussion of the Monkey is wholly misplaced.  Paley does not state that the Monkey captures images through the use of a camera with an image sensor.  Indeed, the Monkey did not capture images at

all. Rather, the Monkey's sensors generated information about their placement, which was fed into an animation program. A1099–A1100. Gamecaster's assumption that real-world images were involved seems to be based solely on the fact that there is photograph of the Monkey in the Paley article. Gamecaster Br. 8 ("imaging of the Monkey shown in the PaleyArticle at Figure 1, a real world image" (emphasis omitted)). In any event, even if the Monkey was somehow used to capture real-world images, that says nothing about the environment in which the Cyclops operated. Nothing in Paley suggests that any real-world images created by the Monkey are the only views being captured by the Cyclops. To the contrary, Paley explicitly states that the Cyclops works with an animated environment—i.e., a virtual environment generated without images captured by a camera with an image sensor. A1100–A1101.

## CONCLUSION

The PTO's rejection of claims 17–33 and 42–46 of the '220 patent should be affirmed.

Respectfully submitted,

AUGUST 22, 2014

s/ Charles S. Barquist

CHARLES S. BARQUIST
MORRISON & FOERSTER LLP
707 Wilshire Blvd.
Los Angeles, California  90017
Telephone:  213.892.5400
CBarquist@mofo.com

CHRISTOPHER B. EIDE
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California  94304
Telephone:  650.813.5600

MARC A. HEARRON
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., N.W.
Suite 6000
Washington, D.C.  20006
Telephone:  202.778.1663

*Counsel for Appellee DreamWorks
Animation SKG, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on August 22, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  August 22, 2014                                s/ Charles S. Barquist
                                              _____

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Rule 32(a) of the Federal Rules of Appellate Procedure because it contains 12,391 words.


Dated: August 22, 2014                          _____
                                                      s/ Charles S. Barquist